UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DEMETRIUS ANTHONY GOMEZ, | Case No. 4:19-cv-00377-BLW |
| Petitioner, | |
| vs. | **MEMORANDUM DECISION AND ORDER** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Petitioner Demetrius Anthony Gomez's Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255 is fully briefed and ripe for adjudication. Dkt. 1, 8.[1] Petitioner was provided with several extensions of time to file a Reply and has not filed anything further in support of his Motion. Dkts. 10, 12. Petitioner was given ample opportunity to reply to his trial counsel's Affidavit (Dkt. 8-1), but he has elected not to do so.

Having carefully considered the parties' filings and considered the record in this matter and in the underlying criminal matter, including the direct appeal decision of the United States Court of Appeals for the Ninth Circuit, and having found that the Motion,

---

[1] All references to the docket are to the civil docket in this case, unless otherwise designated "Crim. Dkt.," referring to the underlying criminal case No. 4:16-cr-00129-BLW-1, *USA v. Gomez.*

**MEMORANDUM DECISION AND ORDER - 1**

file, and the record conclusively show that no relief is warranted, the Court enters the following Order denying the Motion.

## BACKGROUND

The following facts are from the presentence investigation report, the trial transcripts, the affidavit of trial counsel, and other portions of the record in this and the underlying criminal case. Crim. Dkts. 43, 60-62; Dkt. 8-1.

This case involves three cousins who lived on the Fort Hall Indian Reservation, where it is common for a person to be known by a nickname; in fact, some acquaintances and friends do not know the person's given name. See Dkt. 60, p. 36 (Edmo testimony); Dkt. 60, pp. 22-24 (Smith testimony); Dkt. 8-1, p. 3 (at the grand jury hearing, the eyewitness referred to Petitioner *only* by his nickname, not his given name). Demetrius Anthony Gomez ("Petitioner" or "Gomez"), known as "Bash," age 29, lived on and off with his cousin, Ruby Gomez (Ruby"), who owned a trailer home on "B" Street. Another cousin, Tyrone Diaz ("Diaz"), known as "Moons," age 45, also had lived on and off with Ruby, and often stayed at Ruby's even though he no longer lived there. When not staying there, Diaz often checked in on Ruby and her residence, performing yard work and helping her neighbor with automotive work.

On the afternoon of May 9, 2016, Diaz and his girlfriend Natalie Uribe ("Natalie") were together at Natalie's house. Gomez drove up to the house, and Diaz went outside and spoke to Gomez. When Diaz returned to the house, he told Natalie that Gomez was intoxicated and upset and said "something about him getting into like a high-speed chase the night before." Dkt. 60, p. 159.

MEMORANDUM DECISION AND ORDER - 2

Later that day, Diaz and Natalie drove Natalie's father's pickup truck to Ruby's to check on Ruby and Gomez. Natalie, Ruby, Gomez, and Diaz talked and drank alcohol for a bit in Ruby's bedroom. Diaz asked Gomez if he was okay several times, and Gomez was mostly quiet. Diaz exited Ruby's bedroom and went into the bedroom where he kept some of his things. He sat down on a mattress on the floor and began to watch a *Harry Potter* movie. Natalie sat down on the mattress as well.

Natalie said that a few minutes later, Gomez walked into Diaz's bedroom carrying a sawed-off shotgun; Gomez had the barrel pointing down toward the mattress in front of him. Gomez said to Diaz, "I should just fucking shoot you." Diaz barely looked up from the movie and said something like, "Knock it off." Dkt. 60, p. 168. Gomez said, "I should just fucking kill you," to which Diaz didn't even look up but said, "Okay." Seconds later Gomez shot Diaz in the back of his neck, by his ear and jaw. Diaz died from the wounds.

When Gomez shot Diaz, Natalie gasped for air and was going to cry. Gomez said, "Shut the fuck up." Dkt. 60, p. 169. She did. Gomez told Natalie to go into the other bedroom with Ruby. Natalie complied, fearful that Gomez might shoot her. Gomez then asked Natalie to give him a ride somewhere in her dad's truck, retrieved the truck keys from Diaz's body, and gave her the keys. Gomez told her not to leave him, and she assured him she would not. Gomez had begun to take off his clothes to dispose of them.

Once in the car, Natalie decided to get away from Gomez, and sped away in horror and in fear for her own life. Natalie's cousin, November Edmo ("Edmo") encountered Natalie shortly after Natalie had returned home. Natalie was hysterical and could not say anything coherent but, "Oh, my God!" Dkt. 60, p. 35. Edmo took Natalie to Edmo's

house and helped her settle down. After a time, Edmo convinced Natalie to report the shooting. Edmo called 911 and Natalie told police what she knew. At trial, Natalie testified that she reported to investigators that Gomez was "really drunk." Dkt. 60, p. 175.

At Ruby's trailer home, Gomez pulled a carpet out from under Ruby's bed and wrapped Diaz's body in it and dragged the body on the carpet out to a shed in the yard. He placed the body in the shed and shut the door. He swept away the carpet trail in the dirt with a broom.

Gomez started a large bonfire in the yard and burned his clothing and shotgun shells. The metal remains of the clothing and shells were later found in the ashes.

Eight investigators processed the crime scene, with FBI Agent David Bodily supervising the investigation performed by the FBI and the Fort Hall Police Department. A pump shotgun with two rounds in the magazine and two additional rounds were found hidden under a pile of items and clothing in the bedroom where Diaz had been shot, and later Gomez's fingerprints were identified on the shotgun. Gomez was arrested and interrogated soon after the incident, where he waived his Miranda rights and told investigators he didn't remember anything about the incident. In a second interview, he implicated himself as the shooter. The autopsy showed that Diaz had a large amount of methamphetamine in his system. Gomez had been heavily drinking for three days prior to the incident.

On May 10, 2016, Gomez was charged with one count of Second Degree Murder, in violation of 18 U.S.C. §§ 1111 and 1153. Crim. Dkt. 1. On May 24, 2016, a federal

**MEMORANDUM DECISION AND ORDER - 4**

grand jury indicted Gomez for the crimes. Crim. Dkt. 11. Gomez's federal jury trial was

held between January 3-5, 2017. Crim. Dkts. 60-62.

Gomez was represented by Federal Defender Services of Idaho attorney Steven

Richert at trial. Richert declares by affidavit that he decided on a strategy as follows:

> Counsel had several discussions with Mr. Gomez
> about the trial approach. Counsel did not believe that either of
> the other two people in the trailer committed the act, and
> witnesses who did not testify at trial placed Mr. Gomez with
> the possession and use of the weapon the days before the
> crime [sic]. Counsel felt, although incriminatory, that Mr.
> Gomez admit to the crime of manslaughter [sic], and at trial
> assert that the government was overreaching to prove second
> degree murder. Counsel hoped that Mr. Gomez' gross
> intoxication would negate the elements of second degree
> murder. Mr. Gomez agreed to the approach.

Dkt. 8-1, p. 4.

Trial counsel sought and was granted two continuances to prepare for trial before

deciding that he would like to have an independent ballistics expert examine the weapon.

Dkts. 16, 18. Counsel sought and was granted a third continuance of the trial date for

inspection of the weapon, but the shorter-than-requested continuance did solve the issue

that, even if the identified expert could examine the weapon during that time, the expert

still could not fit the trial into his calendar. Dkt. 8-1, p. 3.

Gomez went to trial as scheduled, without the ballistics expert. He was found

guilty of second degree murder. Crim Dkt. 38. At sentencing, this court imposed 360

months of imprisonment, five years of supervised release, a $100 special assessment, and

$5,000 fine. Crim. Dkt. 52. On June 20, 2017, Gomez filed a motion for a new trial,

**MEMORANDUM DECISION AND ORDER - 5**

which was denied. Crim. Dkts. 42, 49, 50. He then filed a direct appeal. Crim. Dkt. 55. The Ninth Circuit Court of Appeals affirmed the conviction and judgment. Crim. Dkt. 65.

On September 30, 2019, Gomez filed the instant motion under 28 U.S.C. § 2255. Dkt. 1. He brings three claims with various subparts: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; and (3) trial court error.

**STANDARD OF LAW FOR REVIEW OF § 2255 MOTION**

Title 28 U.S.C. § 2255 provides that a federal court may grant relief to a federal prisoner who challenges the imposition or length of his incarceration if he shows that "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that a federal district court judge must dismiss a § 2255 motion "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." In order to proceed on a § 2255 motion, the movant must make "specific factual allegations that, if true, state a claim on which relief could be granted." *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984) (citation omitted).

"Under this standard, a district court may summarily dismiss a § 2255 motion only if the allegations in the motion, when viewed against the record, do not give rise to a claim for relief or are 'palpably incredible or patently frivolous.'" *United States v. Withers*, 638 F.3d 1055, 1062-63 (9th Cir. 2011) (citation omitted). Under § 2255, a district court must grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]" 28 U.S.C. § 2255(a).

No hearing is necessary if the allegations can be refuted from the trial record. *Miller v. United States*, 339 F.2d 704, 705 (9th Cir. 1964). Mere conclusory allegations do not warrant an evidentiary hearing. *Shah v. U.S.*, 878 F.2d 1156, 1161 (9th Cir. 1989) (citing *Baumann v. United States*, 692 F.2d 565, 571 (9th Cir.1982)).

Case law and the Rules Governing Section 2255 Cases recognize that courts may expand the record with discovery and documentary evidence. *Blackledge v. Allison*, 431 U.S. 63, 81-83 (1977); *Farrow v. United States*, 580 F.2d 1339, 1352-53 (9th Cir.1978); Rule 7 of the Rules Governing Section 2255 Proceedings. Judges may also supplement the record with their own notes and recollections of the plea hearing, as well as common sense. *Abatino v. United States*, 750 F.2d 1442, 1444 (9th Cir.1985); *Farrow*, 580 F.2d at 1352; *Shah*, 878 F.2d at 1159.

Decisions to hold hearings and conduct discovery in such cases are committed to the court's discretion. *Machibroda v. United States*, 368 U.S. 487, 495 (1962). Section 2255 requires only that the judge give the prisoner's claim "careful consideration and plenary processing, including full opportunity for presentation of the relevant facts." *Blackledge*, 431 U.S. at 82-83. Section 2255 itself "recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner." *Machibroda*, 368 U.S. at 495.

**STANDARD OF REVIEW FOR INEFFECTIVE ASSISTANCE CLAIMS**

A defendant is entitled to effective assistance of counsel at all stages of a criminal proceeding, including plea negotiations, trial, and sentencing. *United States v. Leonti*, 326 F.3d 1111, 1116-17 (9th Cir. 2003). The well-established two-prong test for evaluating

ineffective assistance of counsel claims consists of a showing of deficient performance and resulting prejudice. *See Strickland v. Washington*, 466 U. S. 668 (1984). A defendant must show that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 688, 697. *See also Bell v. Cone*, 535 U.S. 685, 695 (2002). Mere conclusory allegations are insufficient to state a claim of ineffective assistance of counsel. *Shah*, 878 F.2d at 1161.

To establish the first prong, deficient performance, a defendant must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" or that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 686-87. There is a strong presumption that counsel's performance fell "within the wide range of reasonable professional assistance," and judicial scrutiny of that performance must be "highly deferential." *Id*. at 689.

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

**MEMORANDUM DECISION AND ORDER - 8**

> counsel's challenged conduct, and to evaluate the conduct
> from counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court must
> indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance;
> that is, the defendant must overcome the presumption that,
> under the circumstances, the challenged action might be
> considered sound trial strategy.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id*. at 690. An attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete
> investigation are reasonable precisely to the extent that
> reasonable professional judgments support the limitations on
> investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690-91. Further, counsel is not deficient in an area where an investigation would not have been fruitful for the defense. *Id*.

The second *Strickland* prong requires the petitioner to show that the deficient performance prejudiced the defense. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To satisfy the prejudice standard, a

**MEMORANDUM DECISION AND ORDER - 9**

petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This standard is "highly demanding." *Kimmellman v. Morrison*, 477 U.S. 365, 381-82, 86 (1986) (noting that the court should "assess counsel's overall performance throughout the case" when evaluating whether his assistance was reasonable).

Both prongs of the *Strickland* test must be met "before it can be said that a conviction (or sentence) 'resulted from a breakdown in the adversary process that render[ed] the result [of the proceeding] unreliable' and thus in violation of the Sixth Amendment." *United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687). In evaluating an ineffective assistance of counsel claim, the Court need not consider one prong if there is an insufficient showing of the other. *Strickland*, 466 U.S. at 697.

## ANALYSIS OF INEFFECTIVE ASSISTANCE
## OF TRIAL COUNSEL CLAIMS

Gomez's "cumulative error" ineffective assistance of counsel claim and many of his individual ineffectiveness claims fail on the same intertwined factual grounds: Gomez's distance from the victim when Gomez fired the shot is immaterial; being drunk is not a defense to second degree murder; there is no evidence that Gomez was suddenly provoked beyond what a reasonable person could bear during the short time the cousins were in the trailer home together before the shooting; and many of Gomez's proposed witnesses had both inculpatory and exculpatory information.

Criminal defense trial work is an extraordinarily difficult task. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickand*, 466 U.S. at 689. Therefore, a court's task is not to identify the *best* defense, or even just a *better* defense, in a particular case. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Rather, a constitutionally adequate defense requires only that counsel undertook objectively reasonable investigatory work before deciding to forgo other investigations or decide on a defense strategy. Here—cumulatively, or individually—the "errors" attributed to trial counsel do not show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

## 1.  Claim 1(a)(i)

Claim 1(a)(i) is that trial counsel was ineffective for failing to personally investigate the crime scene. In particular, Gomez asserts that counsel should have gone into the trailer home to determine if there was any evidence to refute Dr. Charles Garrison's opinion that Diaz was shot at close range. Dkt. 1-1, p. 15.

Trial counsel declared in his affidavit that he visited the outside premises of the "B" street trailer, but did not go inside the house. Dkt. 8-1, p. 2. Trial counsel further states that to familiarize himself with the inside of the trailer, he relied upon numerous photographs taken by law enforcement as well as Natalie's statements to investigators and the grand jury; Natalie was the only eyewitness. *Id*. Counsel states that measuring the room in question would not have provided any substantive information to refute or rebut Dr. Garrison's testimony that Diaz was shot at close range by the shotgun which bore

Gomez's fingerprint, that the bullet entered from the rear into Diaz' lower neck in the jaw area, and that the shot traveled throughout Diaz's head, killing him. *Id.*

Gomez is unable to show prejudice. Showing that Garrison was wrong about the shooting distance does not necessarily serve as the foundation for a different defense strategy. There is no other evidence in the record that ties a longer shooting distance to a perpetrator other than Gomez. Rather, had counsel hired an expert who refuted the shooting distance, the fact of a longer shooting distance would have bolstered one of Natalie's statements indicating that Gomez may have been about six feet away. Dkt. 60, p. 185 ("Gomez came into the room and stood near the door"). On the other hand, Garrison's shorter shooting distance somewhat bolstered Natalie's drawing and description—that Gomez was standing "right toward the middle of the bed," which was closer to Diaz, who was sitting "toward the middle of the bed opposite from where Mr. Gomez was." Dkt. 61, p. 6.

Importantly, Natalie admitted she was not looking at Gomez or Diaz when the gun went off, which means that Gomez could have continued approaching Diaz when Natalie was looking away. From the totality of the facts, Gomez appears to be the only viable perpetrator, whether he shot from a shorter or longer distance in a trailer house bedroom. The jury had other physical evidence showing that Garrison likely was correct about the short range: one, Diaz had a gun barrel burn entry wound on his body; and two, the shell

casing ended up embedded in Diaz's body.[2] Not only was the physical evidence fairly irrefutable, new proof of a longer shooting distance would not reasonably point to a different shooter.

Gomez brings forward no other persuasive theories or suggestions of how trial counsel prejudiced the defense by viewing only the outside vicinity of the trailer home, but not entering into it. What didn't the eight investigators find? What wasn't shown on the diagrams drawn by several different people? What wasn't seen on the photographs? Gomez doesn't specify.

Gomez also argues that Special Agent Troy Smoot's sketch of the yard and shed should not have been admitted into evidence, but defense counsel did not object. However, defense counsel did visit the outside premises, and Gomez, who was intimately familiar with the outside premises, does not suggest what the factual basis of the

---

[2] Dr. Garrison testified that the shot-shell cup from the shotgun was "recovered in the head at the base of the brain at the top of the vertebral column in C1 and C-2." Dkt. 61, p. 37. He further explained:

> And then the shot cup actually will follow those pellets as it travels, and since it's light, it generally falls off before it goes too far, and how far that goes is variable. But it doesn't go very far because it's small, it's flimsy, and it's going to be stopped by its lack of momentum. Id. So this would be consistent with a wound which is a contact wound where the barrel would be against the decedent, and then the barrel was slightly lifted away from the skin -- at this point maybe 2, 3 millimeters, it's hard to say -- in which then you have burning with flame which comes out here, in this area.

Id. at 43.

> It's my opinion that it was a loose contact wound in the sense that the weapon touched the body and was loose enough that the gases and the escaping particles were able to spread from the opening of the weapon up here into the body which would mean it's a loose contact as opposed to tight contact or intermediate distance wound.

Id. at 46.

**MEMORANDUM DECISION AND ORDER - 13**

objection would have been. Because Claim 1(a)(i) is based on mere speculation, Gomez has failed to show deficient performance or prejudice. This claim, in all its facets, does not warrant relief.

### 2.  Claim 1(a)(ii)

Claim 1(a)(ii) is that trial counsel failed to interview government witnesses and other potential defense witnesses prior to trial. Gomez has not pointed to any government witness or potential witness (that is not the subject of Claims 1(f), (g), and (h)) that trial counsel failed to interview or any prejudice that resulted from such failure, if it did occur. This claim is based on vague speculation and fails for lack of a showing of deficient performance or prejudice. This claim does not warrant relief.

### 3.  Claim 1(b)(i)

Claim 1(b)(i) is that trial counsel failed to object and preserve for appeal the issue that the jury was not instructed that the government must disprove heat of passion or sudden quarrel for Gomez to be found guilty of second degree murder rather than manslaughter. "A defendant is entitled to an instruction upon his theory of the case if the record contains evidentiary support for the theory and the theory is supported by law." *United States v. Lesina*, 833 F.2d 156, 160 (9th Cir. 1987). "To obtain a jury instruction regarding voluntary manslaughter, a defendant must demonstrate to the trial court that the evidence would allow reasonable jurors to conclude the defendant acted out of passion rather than malice." *United States v. Begay*, 33 F.4th 1081, 1088 (9th Cir.), *cert. denied*, 143 S. Ct. 340 (2022) (citing *U.S. v. Quintero*, 21 F.3d 885, 891 (1994)).

**MEMORANDUM DECISION AND ORDER - 14**

Here, if Gomez wanted to rely on sudden quarrel or heat of passion, he was required to negate the malice element by bringing forward evidence showing that he "was not acting maliciously because some extreme provocation, beyond what a reasonable person could be expected to withstand, severely impaired [his] capacity for self-control in committing the killing." *Quintero*, 21 F.3d at 890. Only when such evidence is raised, does the government's burden arise to prove beyond a reasonable doubt the *absence* of sudden quarrel or heat of passion. *Lesina,* 833 F.2d at 160; *see Mullaney v. Wilbur,* 421 U.S. 684, 704 (1975). This Court agrees with the Ninth Circuit Court that "no evidence of either had been introduced at trial." Crim. Dkt. 65, p. 3. Gomez himself has not pointed to facts showing that Diaz or another person provoked him into a sudden quarrel or heat of passion just before the shooting. There is no evidence in the record of what was said when the four persons were sitting in Ruby's room drinking. Ruby did not remember anything and was not called as a witness for that reason. Gomez did not remember anything. Natalie's testimony showed that Gomez said nothing of substance during that time. Dkt. 60, p. 161.

The only evidence in the record near in time to the shooting is that Gomez came into the room and said, "I should fucking shoot [or kill] you." There is nothing in the record showing that these words were prompted by a sudden quarrel among any of the four persons in Ruby's bedroom or that there was anything that "sparked" a heat of passion that was remotely close in time to the shooting. The facts of Gomez's case are much like those in *Begay*, where the Court explained: "The heat of passion or sudden quarrel defenses are used to show that, as a result of some provocation, the defendant

**MEMORANDUM DECISION AND ORDER - 15**

acted rashly and under the influence of intense emotion that obscured the defendant's reasoning or judgment." *Begay*, 33 F.4th at 1089. On that basis, the Ninth Circuit Court concluded that "the evidence did not suggest sudden provocation; rather, it suggested that Begay and Williams had argued about her alleged infidelities before." *Id*.

In this case, trial counsel declares by affidavit that he had numerous discussions with Gomez about facts that might support a heat of passion defense. Trial counsel felt no substantial facts existed to justify a heat of passion instruction. The record supports counsel's conclusion.

Gomez himself has provided nothing showing that the record contained justification for an instruction that the United States must prove absence of facts supporting a sudden quarrel or heat of passion. Therefore, there was no deficient performance of counsel that resulted in prejudice. This claim does not warrant relief, as Gomez has failed to show that, had counsel objected and had Ninth Circuit Court reviewed the claim under a more lenient standard of law, there was a reasonable chance he would have prevailed.

**4.      Claim 1(b)(ii)**

Gomez asserts that trial counsel failed to object to and preserve for appeal a prosecutorial misconduct claim consisting of the prosecutor continually using Gomez's nickname, "Bash," instead of his given name during trial. On direct appeal, under a more demanding plain error standard, the Ninth Circuit Court ruled that, though inappropriate, the prosecutor's use of the nickname "Bash" did not prejudice Gomez's defense. Dkt. 65, p. 3. Here, Gomez argues that using the nickname had the potential to inflame or confuse

MEMORANDUM DECISION AND ORDER - 16

the jury. Gomez's argument has no support in the record. Diaz was referred to as "Moons" throughout the trial, and Gomez was referred to as "Bash." Dkt. 60, p. 36 (Edmo testimony); Dkt. 60, pp. 22-24 (Smith testimony); Dkt. 60, pp. 158-167 (Natalie testimony); Dkt. 8-1, p. 3 (at the grand jury hearing, Gomez was referred to *only* by his nickname, not his given name, by Natalie). There is nothing inherently prejudicial about using nicknames when both the witness and the victim are called by their nicknames, eliminating the inference that the defendant is due less respect than the victim. Because one of the witnesses explained this was common practice on the reservation early in the trial, that set the stage for using the names throughout the trial to avoid confusion when witnesses called the victim and defendant Moons and Bash. The name "Bash" is not inherently prejudicial like gang-related nickname or one that implies wrongdoing, such as "Hothead" or "Trigger Finger."

Further,  Natalie testified that "Bash" was "Demetrius Gomez" on the record. Dkt. 60, p. 158. And the record does not suggest that any other witness  or any jury was confused as to who "Bash" and "Moons" were.

The Ninth Circuit Court concluded that, *given the weight of the evidence*, the inappropriate nickname use was not prejudicial. This Court agrees that the same result would have been reached under a less stringent trial court error standard had counsel objected and been overruled. The evidence at trial pointed to Gomez, also known as "Bash," as the perpetrator. Evidence *in the record but not presented at trial* points to Gomez , also known as "Bash," as the perpetrator. For all of these reasons, this claim does not warrant relief.

MEMORANDUM DECISION AND ORDER - 17

**5.      Claim 1(c)(1)**

Claim 1(c)(1) is that trial counsel failed to obtain an independent crime scene investigator to assist in the defense of the case. Counsel declares that the Federal Public Defenders Office investigator provided substantial investigation and assistance in preparation for trial. Dkt. 8-1, p. 3. Counsel specified that the investigator interviewed Ruby Gomez. *Id*., p. 4. Counsel provided no other details of what the investigator did, but Gomez has not provided any details of what additional evidence an independent investigator would have found that the eight other investigators and the public defender investigator missed. An ineffective assistance claim cannot be based on mere speculation. This claim fails for lack of a showing of deficient performance or prejudice.

**6.      Claim 1(c)(2)**

Claim 1(c)(2) is that counsel should have retained a ballistics expert. Gomez argues that Dr. Garrison was not a ballistics expert, and a defense expert could have proven that it would have been impossible for the victim to have been shot from the distance presented at trial and to sustain such a wound. As set forth above, merely showing that Diaz was shot from a different distance or at a different angle, without more to negate all of the evidence that pointed to Gomez as the shooter, would not have aided Gomez's defense. Therefore, even if assuming that trial counsel performed deficiently by not retaining a ballistics expert during his five months of trial preparation, Gomez has shown no prejudice occurring from the deficient performance.

Gomez does not realize that, had he changed his defense away from admitting the shooting, based on a ballistics expert testifying that the shot could have come from six

**MEMORANDUM DECISION AND ORDER - 18**

feet away, the prosecution would have offered different evidence, as well. Thus, the Court must survey everything that was available.

First, as noted above, whether Diaz was shot at point blank or six feet away would not change any of the other evidence pointing to Gomez as the perpetrator. Why did Gomez burn his clothes and the shotgun shells? Why did he drag Diaz's body out to the shed on a carpet and then try to sweep away the carpet trail in the dirt? Who, except a very drunk person, would have hidden the weapon in the same room that the victim was shot? Who fled the scene and hid out at his sister's house? Whose fingerprints were on the gun that killed Diaz? Who had an argument with Diaz earlier that same day? Who was known to be aggressive and have blackouts when drunk? Who had handled or shot the gun earlier that same week? Once again, how does the distance of the gunshot affect the answers to any of these questions?

Gomez further speculates that a ballistics expert might have opined that the gunshot was not the actual cause of death, but the moving of the body after the shot caused the death. This would have required a second expert, a forensic physician, like Dr. Garrison. The expert opinion of Dr. Garrison that the cause of death was the spray of shotgun bb's into Diaz's head, supported by an x-ray showing the same, could not have been countered by a ballistics expert who is not a medical examiner. Had a forensic physician been hired for the defense, Gomez does not explain how the wounds and the x-ray, coupled with the photographs showing the tremendous outpouring of blood in the room where Diaz was shot (Dkt. 61, p. 316), could have led any expert to conclude that

dragging Diaz's wounded body away would have caused the death, rather than a gunshot to the neck between zero and six feet away.

Given the amount of evidence pointing to Gomez and the lack of any viable alternative shooter, the Court concludes that Gomez was not prejudiced by trial counsel's failure to timely hire a ballistics expert or a forensic physician. This claim does not warrant relief.

**7.    Claim 1(d)**

Claim 1(d) is that counsel should not have (informally) stipulated that Gomez shot and killed Diaz. In opening argument, counsel stated that Gomez caused the death of his cousin, Dkt. 60, p. 25, but that the United States wrongfully prosecuted him for second degree murder, when it had no evidence of malice. Counsel also formally stipulated that a fingerprint found on the shotgun belonged to Gomez. Dkt. 60, p. 138.

Trial strategy is particularly difficult to challenge in a § 2255 action. Counsel must take into consideration the facts provided by his own client:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

*Strickland*, 466 U.S. at 691.

Counsel declares by affidavit that he made the decision to admit that Gomez caused Diaz's death in light of the evidence in the case and after several discussions with Gomez about the trial approach. Dkt. 8-1, p. 3. Gomez does not contest counsel's statement that Gomez approved the defense used—to admit to the killing and try to

reduce the charge to manslaughter. *Id*. Gomez states that he believed that "stipulating would lessen the offense if he committed the offenses while intoxicated with a lack of memory." *Id*. (spelling regularized).

Had counsel not decided on this strategy, the prosecution would have had ample evidence—beyond what already has been discussed in this Order—to draw from to prove that Gomez killed Diaz. For example, the presentence investigation report contained this information:

> Reports from the Federal Bureau of Investigation indicated that a confidential witness provided information to law enforcement regarding conversations exchanged between Demetrius Anthony Gomez. On August 12, 2016, the confidential witness was moved to the Mini-Cassia Jail in Burley, Idaho, and was placed in the same cellblock as Demetrius Anthony Gomez. Their cells were across the hall from each other. Demetrius Anthony Gomez questioned the confidential witness about his case and why he was "locked up." This led the confidential witness and Demetrius Anthony Gomez discussing the Indian reservation and who they both knew. The confidential witness then asked him why he was held in custody. Demetrius Anthony Gomez stated that he "blew his cousin's head off," because he felt his cousin was going to testify against him.

Dkt. 47, p. 7.

Further, the presentence investigation report reflects that, after Gomez's first hearing in federal court, police investigators conducted an interview with Gomez (who had waived his Miranda rights), in which Gomez all but confessed. Dkt. 61, p. 95. The content of that interview would have been admissible at trial as an admission of Gomez:

> When he was shown a picture of the deceased body of Tyrone Kelly Diaz, he did not make any statements; however, he did begin to cry. During the interview, he stated "How

**MEMORANDUM DECISION AND ORDER - 21**

much time am I looking at, Man? Because I've seen people on the rez do murder do seven, three, ten years, you know." He admitted to consuming a large quantity of alcohol on the date of the shooting, noting he was unable to remember the details of what happened on that day.

When he was shown a picture of the shotgun recovered at the residence and asked if he had ever seen the firearm before and who it belonged to, he stated "Yes, I have. I don't even know (who it belongs to). I think it's the devil's. I think it's the devil's because it came out of nowhere. I was just… I don't know. I was fucked up."

He further noted "I remember bits and pieces. I just want to tell them – if you talk to my family, just tell them, you know, I am sorry. I love them. My mind wasn't right… What I remember was I was there. I was listening to some music in the background because they got a TV back there with a surround sound… I remember Natalie because she was there, I remember seeing her."

Demetrius Anthony Gomez went on to state, "I don't know what I did. *I know it was me*. Everyone is saying it was me. I guess Natalie was right there."

Dkt. 47, p. 6 (emphasis added).

Defendant himself knew that "he had a serious drug and alcohol problem and that his use of drugs and alcohol caused him to be very angry and violent." Dkt. 47, p. 22 (presentence investigation report). Defendant communicated his drinking problem to counsel, who used the information to form the defense strategy. Even if Gomez did not disclose to counsel that Gomez became very angry and violent when drunk, had Gomez proceeded to trial on a theory that he did not commit the killing, the prosecution could have called Nicole Ariwite and Ruby Gomez to bring this point to the attention of the jury, as the presentence investigation report shows that both potential witnesses had

knowledge that Gomez could be aggressive when intoxicated, as well as that he was prone to blacking out after drinking heavily. Dkt. 62, p. 30.

Gomez states now that counsel should have chosen as a trial strategy that Natalie committed the crime, but she blamed Gomez because she knew he was intoxicated and would not remember what she had done. Dkt. 1-1, p. 20. Gomez also argues that counsel could have strategized that Ruby killed Diaz, or that Natalie and Ruby killed him together. Had counsel selected one or both of these alternative perpetrators, counsel also could have argued that Gomez merely helped them cover up their wrongdoing by dragging out the body, sweeping up the carpet marks, hiding the weapon, and burning the gun shells and his clothing. *Id.*, p. 21. Counsel could have used the fact that Ruby's neighbor saw a male and a female by the fire to Gomez's advantage, if the argument was that Gomez was merely helping cover up the death.

While Gomez's alternative defense theory has initial appeal, there is little to support it. Though Gomez had no memory of the night in question, he surely would have had some information to help bolster such a defense from what he knew of Diaz, Natalie, and Ruby. But he did not offer any to his counsel and does not offer any here.

There is no evidence of motive. Even had counsel had argued that Natalie and Diaz had a sudden argument (of which there is no evidence), that Natalie did not call police on her own, that she also could have been in shock if she had just killed Diaz with a shotgun, and that her discrepancies showed that she was lying, the prosecution would have brought forward different evidence. The prosecution had Gomez's admission to a confidential informant and to investigators that he caused the death, witnesses' testimony

**MEMORANDUM DECISION AND ORDER - 23**

that Gomez had handled the shotgun earlier in the week, testimony that Gomez and Diaz had argued earlier that day, and evidence that Nicole likely helped Gomez clean up the crime scene. Gomez cannot assume that the prosecution would not have brought forward evidence supporting the element of the crime that he otherwise stipulated to.

No crucial evidence points to Natalie as the perpetrator. If Natalie had killed Diaz and asked Gomez for help, it is unclear why she would not have burned her own clothes, rather than only Gomez burning his clothes. The fire contained fragments of Gomez's clothing rather than Natalie's. Only Gomez's fingerprints were found on the weapon. Gomez has no reasonable explanation for how Natalie would have obtained the shotgun in the trailer home.[3]

With eight investigators combing through the evidence, nothing in the record shows that Natalie was ever a viable suspect or that she invoked her Miranda rights before speaking to police. Natalie had many discrepancies among the versions of her story, but it has been reasonably assumed by investigators, attorneys, and likely the jury (implied by the verdict), that the discrepancies were a result of having witnessed the sudden, shocking, and senseless death of her boyfriend.

Gomez has not come forward with anything helpful to counter the evidence presented at trial and the evidence known but not presented at trial. Based on all of the

---

[3] There is even less evidence pointing to Ruby as the perpetrator. The evidence showed that Diaz often took care of Ruby's trailer when she was gone and that he often checked in on her to make sure she was doing okay. There is also no evidence pointing to why Ruby and Natalie would have worked together to shoot Diaz.

**MEMORANDUM DECISION AND ORDER - 24**

potential evidence, there is no reasonable probability that the trial outcome would have been different had counsel not stipulated that Gomez shot and killed Diaz but either would have tried to blame Natalie, Ruby, or both of the for the shooting.

Counsel knew the evidence he would face at trial if he did not choose to limit the trial strategy to trying to negate malice. Informed, strategic choices by trial counsel are "virtually unchallengeable." *Strickland*, 466 U.S. at 689-90. Here, the record reflects that the decision to concede the causation of the death was informed and strategic. Hence, Gomez's claim fails.

**8.     Claim 1(e)**

Claim 1(e) is that trial counsel failed to argue a diminished capacity or voluntary intoxication defense. The law does not support this claim. "[T]he so-called 'exculpatory' rule, under which drunkenness may be taken into account to show that a particular state of mind . . . was not present" applies only to first degree murder, a specific intent crime. *Kane v. United States*, 399 F.2d 730, 736 (9th Cir. 1968), *cert. denied*, 393 U.S. 1057 (1969). Here, Gomez was charged with second degree murder, which requires only general, not specific, intent. *See United States v. Lopez*, 575 F.2d 681, 684 (9th Cir. 1978). Counsel did not perform deficiently because he knew the law would not have allowed him to argue either theory as a defense to second degree murder. However, counsel did his best to argue that Gomez's intoxication, *together with Diaz's methamphetamine use*, likely led to *a struggle between them* and to the unintentional killing, rather than Gomez having formed an intent to kill. Dkts. 60, pp. 25 -26; 61, p.

126. For the foregoing reasons, counsel was not deficient, and Gomez did not suffer prejudice to his defense. No relief is warranted.

**9.    Claim 1(f)**

Claim 1(f) is that trial counsel failed to interview and subpoena potential witness Nicole Ariwite. The record reflects that counsel undertook enough of an investigation to determine that this witness would not be helpful at trial, and thus did not call her as a matter of strategy. Gomez has neither submitted an affidavit of what this witness's testimony would have provided, nor responded to his counsel's Affidavit. In addition to counsel's Affidavit, the record reflects that this witness testified at the grand jury hearing and spoke to investigators, sources that gave counsel additional information that reduced the need for personal investigation.

Gomez and Nicole Ariwite were in a romantic relationship for nine months prior to the incident; thus Ariwite would be painted as biased witness by the prosecution. Dkt. 47, p. 20. Trial counsel personally interviewed Ariwite. Dkt. 8-1, p. 4. Trial counsel determined that Ariwite would have testified that she tried to retrieve the weapon from Gomez hours before the crime and that she saw, at least a similar weapon, with Gomez. *Id*. Counsel had serious concerns that Ms. Ariwite may have assisted Gomez at the crime scene after the crime. *Id*. A neighbor, Meryl Smith, testified that he saw a woman and a man outside near the bonfire. Dkt. 61, p. 21.

Contrary to counsel's Affidavit, Gomez believes that Ariwite testified at the grand jury hearing that she had not seen Gomez with a shot gun the day before and said that he did not have a gun. Dkt. 1-1, p. 24. Gomez's speculation about Ariwite's grand jury

testimony is controverted by the presentence investigation report, clarifying that Ariwite

"admitted that she had made a report to an FBI agent, prior to the grand jury proceedings,

and that she was shown pictures of a gun which she said it *looked like one she had seen*,

but was not the gun that she had seen." Dkt. 47, p. 25 (emphasis added).

The presentence investigation report also notes:

> On May 12, 2016, Nichole Ariwite was interviewed by law enforcement. Ms. Ariwite indicated that when she picked up Demetrius Anthony Gomez and Ruby Gomez from the residence on B Avenue, she observed that Demetrius Anthony Gomez was only wearing boxer shorts, he was extremely intoxicated, and noted "he was on a mad rampage." She acknowledged that she saw a shotgun that Demetrius Anthony Gomez had possessed, and she described the gun to be short, a pump action, and black and silver in color. She reported that she saw the shotgun in his possession earlier that day in her vehicle. She was trying to hand the shotgun to someone else out the window; however, Demetrius Anthony Gomez was upset, and he wanted to take the shotgun back. She indicated Demetrius Anthony Gomez was crying "the whole time," however, she did not expand on why he was crying.

Dkt. 47, p. 5. Even if Ariwite made contradictory statements about whether or not

she had seen Gomez with a shotgun, the jury would hear all of her statements and have to

determine credibility, with the prosecution being able to argue bias.

Ariwite said during an interview that Gomez had been drinking heavily for three

days, and on the second day, Jenawade Apodaca had brought over two bottles of gin and

vodka, and he drank both of them. *Id*. Ariwite also had acknowledged that Gomez could

be aggressive when intoxicated and that he was prone to blacking out after drinking

heavily. Dkt. 62, p. 30.

**MEMORANDUM DECISION AND ORDER - 27**

Supporting counsel's declaration that he and Gomez determined that Ariwite

would not be helpful at trial, is the fact that counsel filed a motion in limine as follows:

> COMES NOW Demetrius Gomez, by and through
> counsel, and respectfully moves in limine to prevent
> questioning of anticipated witness Nicole Ariwite concerning
> the hearsay statements allegedly made by Ruby Gomez to
> Ms. Ariwite. During an interview with law enforcement, Ms.
> Ariwite advised that Ruby Gomez made several statements to
> her concerning the events of May 9, 2016. The statements, if
> true, would tend to provide incriminating information
> concerning Demetrius Gomez. In particular Ms. Ariwite
> advised that Ruby Gomez said that Demetrius Gomez and
> Tyrone Diaz were arguing on the late afternoon of May 9th,
> and further that Mr. Diaz slapped and intentionally tried to
> irritate Demetrius Gomez. Based upon the information so far
> provided to Demetrius Gomez, Ruby Gomez denies that
> Demetrius Gomez and Mr. Diaz argued or exhibited any
> conflict on May 9th.

> Demetrius Gomez avers that allowing the government
> to explore the potentially prejudicial hearsay statements with
> Ms. Ariwite would unduly and unnecessarily prejudice the
> jury. Demetrius Gomez does not know whether Ms. Ariwite
> will be a "hostile" witness to the government, however, based
> upon her grand jury testimony she may be designated as
> "hostile," thus allowing the government to cross exam her.

Based on all of the foregoing, it is clear that counsel performed an adequate

investigation and that no prejudice resulted from the strategic decision not to call Ms.

Ariwite as a trial witness—under any possible defense theory. Counsel states by affidavit

that he discussed these concerns with Gomez, who agreed that she would be more

harmful that helpful should she testify at trial. *Id*. Gomez did not contest the contents of

the Affidavit.

**10.     Claim 1(g)**

Claim 1(g) is that trial counsel failed to interview and subpoena potential

witnesses Jenawade Apodoca. The record reflects that counsel undertook enough of an

investigation to determine that this witness would not be helpful at trial, and thus did not

call her as a matter of strategy.

Gomez told counsel that Apodoca drank heavily with Gomez in the days before

the crime. *Id*. Apodoca saw Gomez with the weapon and saw him discharge it a day or

two before the crime. *Id*. Counsel did not believe that Apodoca would be a helpful

witness based on Gomez's information and did not interview her. *Id*. Because the

information provided to counsel by his client demonstrated that the testimony could be

more harmful than helpful, counsel was not deficient for not further investigating this

witness or subpoena her for trial as a matter of strategy, and no prejudice to the defense

resulted.

**11.     Claim 1(h)**

Claim 1(h) is that trial counsel failed to interview and subpoena potential

witnesses Ruby Gomez, who owned the trailer and was present in a different bedroom

when Diaz was shot. The record reflects that counsel undertook enough of an

investigation to determine that this witness would not be helpful at trial, and thus did not

call her as a matter of strategy. The record reflects that this witness testified at the grand

jury hearing and spoke to investigators, sources that counsel had, in addition to his own

investigation.

Counsel and the investigator both interviewed Ruby, but she said that she neither saw nor heard anything at the time of the crime, indicating that she had "passed out" on her bed in her own bedroom. Dkt. 8-1. Ruby would not have been a helpful witness under those circumstances.

When interviewed by investigators, Ruby said the following:

> She indicated that she knew Tyrone Kelly Diaz was dead when she left the residence. She said that Demetrius Anthony Gomez lit a fire in the yard of the residence, and noted that Demetrius Anthony Gomez "probably" had thrown the shotgun shells in the fire. She stated that she did not hear the gun go off, nor did she observe the removal of the body from the residence as she had consumed too much alcohol and had "passed out" in her bedroom. She noted she awoke to Natalie Uribe crying and telling her that Tyrone Kelly Diaz was dead.
>
> Ruby Gomez said she and Demetrius Anthony Gomez were then picked up by Nichole Ariwite and they traveled to the residence of Stacie Gomez.

Dkt. 47, p. 5 (presentence investigation report). In addition, Ruby had knowledge that Gomez could be aggressive when intoxicated and that he was prone to blacking out after drinking heavily. Dkt. 62, p. 30.[4] Counsel had sufficient information to realize that Ruby had harmful testimony and should not be called as a witness. Counsel was not deficient in making this strategic decision, and the defense was not prejudiced.

---

[4] The United States had issued a writ of habeas corpus ad testificandum for Ruby Gomez for trial, but it was returned unexecuted on the last day of trial. Dkt. 37. At that time, Ruby was incarcerated at the Pocatello state women's prison. *Id.* That Ruby was easy to find in prison tends to show that the prosecution decided it was unnecessary to present Ruby's testimony, likely because of defense counsel's concession that Gomez fired the shot.

**MEMORANDUM DECISION AND ORDER - 30**

As to all of these witnesses, the record reflects that trial counsel did enough investigatory work to make informed strategic choices not to call them as witnesses. *See Strickland*, 466 U.S. at 689-90. Beyond counsel's own investigation, he had the benefit of grand jury testimony and police investigatory interviews. Gomez has not come forward to controvert counsel's Affidavit with his own affidavit or one from any of these witnesses to show that their testimony would have been more helpful than harmful.

Adopting a strategy that would keep jury from hearing that Gomez had handled and discharged the murder weapon or a similar weapon earlier in the week prevented the jury from having additional information to support a malice aforethought argument. All the jury knew was that Gomez had found the gun shortly before the shooting, which favors the defense theory that Gomez had not been thinking about shooting Diaz any sooner than a few moments before he was shot. Trial counsel's performance was not deficient, not was there any prejudice from omitting the testimony of these three witnesses at trial.

## 12.   Claim 1(i)

Claim 1(h) is that counsel failed to petition for a rehearing in the Ninth Circuit or file a petition for a writ of certiorari with the United States Supreme Court. Counsel states that he did not believe that filing for rehearing, en banc review, or Supreme Court review would be of value. Dkt. 8-1, p. 4. The Court agrees that, on this record, there was not a reasonable chance that any further briefing to any court would have been fruitful. Counsel was not deficient and there was no prejudice. This claim will be denied.

**13.    Claim 1(j)(i)**

Claim 1(j)(i) is that trial counsel failed to adequately prepare for trial. In support of this argument Gomez argues that if counsel had been adequately prepared he would have filed a motion to suppress the weapon because "the crime scene was contaminated." Dkt. 1-1, p. 31. The gun was found after a search warrant had been issued. *Id*. at 147. Gomez is mistaken in believing that the record supports a contention that a motion in limine would have been granted on this argument.

Detective Bodily testified at trial that the murder weapon was found hidden under a pile of items stacked in the corner of the bedroom where Diaz was shot. Dkt. 60, p. 134. Bodily testified that someone in the trailer house and police officers had moved several items after the shooting occurred. For example, someone (not police officers) had moved a sofa "to cover up a blood trail down the hallway." *Id*. p. 142. Bodily did not know whether a wood item had been moved by looking at the photographs, but he was present when the murder weapon was found, and so he could testify more accurately as to the weapon from the photographs and his own memory. *Id*., p. 143. He testified: "The firearm was not in plain view. It was hidden in a corner." *Id*., p. 148.

In one photograph the weapon is lying visibly in the room. Items were moved to take the photograph, Bodily explained. He testified that, when investigators perform a search, they take photos before anything is moved. Then, as they search they remove things and take more photographs, hence, the visible weapon photo was produced. Bodily said that they "peel like an onion layer back [sic] so that we find things. As soon as we find something like a shotgun that was covered under a lot of other material, we

MEMORANDUM DECISION AND ORDER - 32

photograph it in place. So it had been buried under a lot of personal items hidden in that corner, and when we found it after we removed all those personal items, we photographed it." Dkt. 61, p. 82.

But Gomez asserts that no photos were taken of the items found on top of the alleged hidden weapon (and the United States has not controverted this assertion), which is contrary to Bodily's testimony about what normally is done. Bodily, himself, however, was at the crime scene at the time the weapon was found. That there exists no photo of the items piled on the gun does not necessarily show "contamination" or intentionality but could show oversight or negligence. The jury was able to assess whether Bodily unintentionally did not follow his regular routine, or whether he intentionally manipulated the evidence; from the totality of evidence relating to the shotgun location, the jury was able to choose to believe or disbelieve his testimony about finding the gun. Dkts. 60, pp. 133-35; 61, pp. 271-273. The absence of a photo showing the covered gun does not prove that the scene was "contaminated" and that the gun should not have been entered as an exhibit, as the gun itself was properly identified by Bodily, apart from any photographs. Dkt. 60, pp. 134-35.

Trial counsel has declared that he did not then, and does not now, see grounds for a motion to suppress the shotgun. Dkt. 8-1, pp. 4-5. The Court agrees. If investigators were not permitted to move things to find hidden evidence at a crime scene, many crimes would go unsolved. Instead, there is a clear pattern of taking photographs at different stages of the investigation to show the progression of searching under things; alternatively, eyewitness testimony about the finding and identification of hidden

**MEMORANDUM DECISION AND ORDER - 33**

evidence is appropriate, with credibility of the investigator to be determined by the jury. Gomez's argument is one of weight, not admissibility. Failing to take a certain photograph does not equal contamination of the crime scene. Gomez's claim fails on both the performance and the prejudice prong of *Strickland*.

**14.    Claim 1(j)(ii)**

Gomez further contends that the United States' witnesses contradicted one another, and that counsel was unprepared because he did not present any demonstrative or tangible evidence that would disprove the inconsistent witness accounts or the government's case. Dkt. 1, p. 31.

It is true that Dr. Garrison's testimony that the shooting was point-blank and Natalie's testimony that Gomez was standing across or in the middle of the room, several feet away from the victim, seemed contradictory. However, Natalie admitted she did not see Gomez shoot Diaz. Gomez could have moved across the room to stand next to Diaz while she was not looking in that direction. That is the simplest explanation that could have been made by the prosecution, regardless of whether defense counsel would have attempted to raise the contradiction in a more aggressive manner than he did at trial. Dkt. 60, pp. 48-49. No tangible or demonstrative evidence was needed because the distance between the shooter and the victim was not exculpatory, given the other evidence.

The Court agrees that more could have been done to show that Natalie had contradicted herself on several of the facts, like whether a group of people were standing outside the trailer when they arrived, where Gomez was standing, or whether he pointed the gun at her or down at the mattress when he told her to shut up. But, she was the only

eyewitness, and the fact that she witnessed such an unexpected and horrific event provided a natural excuse for the discrepancies. Badgering her over them may have caused the jury to resent Gomez and his counsel. The prosecutor pointed out in closing that, despite the shocking event and the discrepancies that followed, the one constant in Natalie's stories was that Gomez said something like, "I should fucking shoot you," or "I should just fucking kill you" twice just prior to the shot.

However, even if counsel was deficient in not doing more to raise discrepancies with the government witnesses' testimony with tangible or demonstrative evidence, what would doing more have produced? The facts are incredibly confining. Ruby remembered nothing. Gomez remembered nothing. Natalie was the only witness who remembered anything, and to show that she did not remember the facts accurately would not have shown that she, or another person that was not Gomez, killed Diaz. More or different cross-examination, with or without exhibits, would not have changed the limited facts about the killing and about the aftermath that were presented to the jury.

As noted above regarding Dr. Garrison's testimony, any tangible or demonstrative evidence regarding the distance of the shooter from the victim would not overcome the wealth of evidence against Gomez or the dearth of evidence against Natalie, Ruby, or both. For these reasons, Gomez's claim will be denied.

## ANALYSIS OF PROSECUTORIAL MISCONDUCT CLAIMS

### 1. Claim 2(a)

Claim 2(a) is that prosecutorial misconduct occurred based on the prosecutor's opening and closing statements that were inaccurate or not proven. Gomez specifically

asserts that, "the government did not prove that the Defendant shot Diaz as offered in its opening, even its own witnesses proved that Diaz was not shot in the back of the head." Dkt. 1, p. 31. On direct appeal Gomez raised the same issue. The Ninth Circuit Court of Appeals held that the district court did not plainly err when it declined to order a new trial based on the prosecutor's arguably inaccurate statements regarding the location of victim's wound because those statements were not prejudicial. Crim. Dkt. 65, p. 2.

This claim cannot be raised in a § 2255 motion because it was already raised and decided on appeal. In the Ninth Circuit, the law "is clear that when a matter has been decided adversely on appeal from a conviction, it cannot be litigated again on a 2255 motion." *Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972); *see United States v. Hayes*, 231 F.3d 1132, 1139 (9th Cir. 2000) ("When a defendant has raised a claim and has been given a full and fair opportunity to litigate it on direct appeal, that claim may not be used as basis for a subsequent § 2255 petition.").

Even if the Court heard this claim again, it would rule as it did in its denial of the Motion for a New Trial on this subject. Dkt. 50. There was no implication or statement by the prosecutor that the shooting was "execution-style," as Petitioner asserted. Dr. Garrison, the forensic pathologist, sometimes used in his testimony the same type of language the prosecutor had used, for example, the "cause of death was the result of the gunshot wound, or shotgun wound, rather, to the head." Dkt. 61, p. 33. The trial participants used general terms to talk about the location of the entry wound *because* (1) *the only eyewitness established that Gomez approached the victim more or less from behind, given that the victim was watching a movie and did not turn around when he*

**MEMORANDUM DECISION AND ORDER - 36**

*conversed with Gomez*, and (2) the shot, in part, damaged the head, as well as the neck. The general use of the term "back of the head" did not counteract Dr. Garrison's extensive presentation to the jury about the location of the wound or the photographs of the wound. This claim warrants no relief.

## 2.      Claim 2(b)

Gomez asserts that the prosecution failed to provide him with information about a Nike shoe print found on the victim's chest and a hair found in the victim's hand. He asserts that the prosecution withheld this exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The United States argues that Gomez has procedurally defaulted this claim by failing to raise it on direct appeal and, alternatively, that the claim is not meritorious.

Gomez learned of these facts from the investigatory reports during pretrial discovery proceedings. Because his *Brady* claim is based on conduct that occurred during pre-trial proceedings and before judgment, the claim could have been raised on direct appeal. It was not. Accordingly, the *Brady* claim is procedurally defaulted. *See, e.g., United States v. Frady*, 456 U.S. 154, 162, 164 (1982); *United States v. Johnson*, 988 F.2d 941 (9th Cir. 1993).

Once a claim has been procedurally defaulted, a court may entertain that claim in a § 2255 proceeding only under two circumstances. First, the defendant must make a colorable showing of actual, factual innocence. *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995); *United States v. Benboe*, 157 F.3d 1181, 1183 (9th Cir. 1998)). Second, the

defendant can establish cause for failing to raise the issue and resulting prejudice. *Frady*, 456 U.S. at 162, 164; *Benboe*, 157 F.3d at 1183.

Here, Gomez has not demonstrated either exception applies. Hence, this Court cannot hear the merits of this claim.

**3.      Claim 2(c)**

Claim 2(c) is that the prosecutor knowingly presented perjured testimony. *See Napue v. Illinois*, 360 U.S. 264 (1959). Gomez asserts that the United States admitted that there were inconsistencies in Natalie's testimony, and because the prosecutor knew this before he called her as a witness, he therefore knew he was putting on a witness who was lying.

Inconsistencies do not necessarily mean a witness is lying. Gomez, if anyone, should realize that human memory is inaccurate and fallible. A humans' verbal descriptions of their perceptions—especially of surprising, shocking events—cannot be repeatedly regurgitated in exact form. The jury is charged with determining whether discrepancies mean that a witness is lying, or that the witness is performing as a normal human being under the circumstances. This claim has no merit.

For the same reasons and those described in the section discussing Claim 1(j)(i), Gomez's assertion that Detective Bodily's lack of a photograph of the items covering the hidden gun amounts to subornation of perjury is meritless.

Alternatively, Gomez is procedurally barred from raising this claim in a § 2255 motion because he could have raised it on direct appeal. *See Frady*, 456 U.S. at 162, 164.

**MEMORANDUM DECISION AND ORDER - 38**

Gomez has neither demonstrated actual innocence nor shown and prejudice to excuse the default of this claim. As a result, the Court cannot hear the merits of the claim.

## ANALYSIS OF TRIAL COURT ERROR CLAIMS

**4.     Claim 3(a) through (c)**

In Claim 3, Gomez asserts various trial court errors: (a) the court should not have accepted the United States' and Gomez's informal stipulation that Gomez shot and killed the victim without Gomez's knowing and voluntary agreement (this "stipulation" was actually a strategic concession Gomez's counsel made in opening argument); (b) the court should not have denied Gomez's motion to continue the trial, preventing him from retaining and presenting a ballistics expert's opinion; and (c) the court should have granted Gomez an instruction for involuntary manslaughter.

As with the prosecutorial misconduct claims, if errors at trial are known to the defendant and do not require extra-record development (like ineffective assistance of counsel claims, which require counsel to state why they made certain decisions), then a defendant must raise the errors on direct appeal. These trial errors fall into that category. Therefore, the claims are procedurally defaulted, and no excuse has been presented to permit Gomez to proceed. Hence, this Court cannot hear the merits of this claim.

## CONCLUSION

Because the Motion, files, and records of the case conclusively show that the prisoner is not entitled to relief under 28 U.S.C. § 2255, the Court concludes that an evidentiary hearing is unnecessary. *See U.S. v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003). To the extent that the Court has not expressly denied each and every argument,

**MEMORANDUM DECISION AND ORDER - 39**

issue, subclaim, and cumulation of claims Gomez has made, the Court concludes that any

such arguments, issues, subclaims, and cumulation of claims not addressed in particular

in this Order do not warrant relief. Gomez's Motion will be denied.

### ORDER

**IT IS ORDERED:**

1.  Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28

    U.S.C. § 2255 (Civ. Dkt. 1) and (Crim. Dkt. 67) is DENIED.

2.  No certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(1).

3.  Petitioner may request a certificate of appealability from the Ninth Circuit

    Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b) and

    Local Ninth Circuit Rule 22-1. To do so, he must file a timely notice of appeal.

4.  If Petitioner files a timely notice of appeal, and not until such time, the Clerk

    of Court shall forward a copy of the notice of appeal, together with this Order,

    to the Ninth Circuit Court of Appeals. The district court's file in this case is

    available for review online at www.id.uscourts.gov.

DATED: March 7, 2023

B. Lynn Winmill
U.S. District Court Judge